**Bogdan DUMITRU, Plaintiff,**

v.

**PRINCESS CRUISE LINES, LTD., Defendant.**

Nos. 09 Civ. 4792 (NRB), 10 Civ. 1790 (NRB).

United States District Court, S.D. New York.

July 29, 2010.

Kevin P. Claffey, Esq., Law Office of Kevin P. Claffey, P.C., New York, NY, Michael F. Guilford, Esq., Nicholas G. Sakellis, Esq., Michael F. Guilford, P.A., Ross B. Toyne, Esq., Toyne & Mayo, P.A., Miami, FL, for Plaintiffs.

Jean–Claude Mazzola, Esq., Wendy J. Lindstrom, Esq., Wilson Elser Moskowitz

Edelman & Dicker LLP, New York, NY, Gregory K. Lee, Esq., William K. Enger, Esq., Wilson Elser Moskowitz Edelman & Dicker LLP, Los Angeles, CA, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Bogdan Dumitru brought this action against Princess Cruise Lines ("PCL"), alleging several claims arising out of an injury that Dumitru sustained while he was employed on one of PCL's vessels. Dumitru has filed two related cases [1] which, combined, assert four causes of action:

(1) Negligence under the Jones Act, 46 U.S.C. § 30104;

(2) Unseaworthiness under General Maritime Law ("GML");

(3) Maintenance and cure under GML; and

(4) Unpaid and penalty wages under the Merchant Seaman's Protection and Relief Act ("Seaman's Wage Act"), 46 U.S.C. § 10313. Plaintiff initially filed both actions in state court in the Supreme Court of the State of New York, New York County, and defendant removed the cases to this Court.

Presently before the Court are defendant's motion to compel arbitration, brought pursuant to 9 U.S.C. § 3, and plaintiff's cross-motion to remand the matter to state court. For the reasons stated herein, defendant's motion is granted in part and denied in part, and plaintiff's motion is denied.

## FACTUAL BACKGROUND [2]

PCL is a large cruise operating company incorporated in Bermuda, with its base of operations headquartered in Santa Clarita, California. Bogdan Dumitru is a Romanian citizen who was employed aboard one of PCL's ships, the M/V Star Princess. Dumitru was recruited by PCL in Bucharest, Romania, where, on November 30, 2006, he signed a written contract entitled "Acceptance of Employment Terms and Conditions" (hereafter, the "Acceptance Agreement"). Mem. in Supp. of Def.'s Motion to Compel Arbitration (Case 1) 2. On December 2, 2006, Dumitru began work as a buffet steward on the M/V Star Princess, a vessel that flies the flag of Bermuda. *Id.* at 2, 16. According to plaintiff, he joined the M/V Star Princess in Fort Lauderdale, Florida, where the vessel began its voyage. Oral Argument Tr. 10.

The subject of this suit is an injury that Dumitru allegedly sustained in the course of his employment on February 19, 2007. Dumitru claims that he slipped on a wet surface and fell down a set of stairs on the ship, resulting in a broken ankle that has yet to heal. Oral Argument Tr. 2–3, 14. Defendant claims that Dumitru broke his ankle playing soccer on the deck of the ship. *Id.* at 36. The parties agree that, shortly after the incident, Dumitru disembarked in the Cayman Islands and was treated at a hospital where he underwent surgery. *Id.* at 10, 36. Dumitru later returned to Romania, where he now resides. *Id.* at 10. According to plaintiff, his ankle requires another surgery and the injury continues to prevent him from working. *Id.* at 14. Although PCL paid for the first surgery and some part of

---

**1.** For purposes of this memorandum, "Case 1" refers to the action under docket number 09 Civ. 4792, and "Case 2" refers to the action under docket number 10 Civ. 1790.

**2.** Unless otherwise noted, the following facts are undisputed by the parties.

Dumitru's other medical expenses, Dumitru claims that PCL has failed to fully compensate him for his injury and to fulfill their obligation to provide maintenance and cure. *Id.* at 9–10. Dumitru also claims that PCL failed to pay him all accrued wages upon discharge as required by the Seaman's Wage Act. *Id.* at 11–14.

The Acceptance Agreement that Dumitru signed contains the following provision, which is highlighted in a box on the document:

> *Arbitration Notice and Agreement*
>
> As provided by the Principal Terms and Conditions of Employment, which are deemed to be incorporated herein by reference, the Company and I hereby acknowledge that my employment with the Company constitutes an international commercial relationship between foreign parties, and we agree that any and all disputes shall be referred to and resolved by arbitration as provided for in the Principal Terms and Conditions of Employment.

·Decl. of Doug Sauceda in Supp. of Pl.'s Motion to Compel Arbitration (Case 1), Ex. A. By signing the Acceptance Agreement, the crew member acknowledges that he has reviewed and agreed to abide by the Principal Terms and Conditions of Employment (hereafter, "Terms and Conditions"), which are provided to each crew member. *Id.*

The Terms and Conditions contain an Article 14, entitled "Governing Law, Arbitration, Venue and Examinations," which provides in pertinent part:

> [T]hese terms and any such disputes arising under or in connection with these terms or crew member's service shall be governed exclusively in all respects by the laws of Bermuda, without regard to principles of conflicts of laws. This agreement is made pursuant to a legal relationship involving international commerce between foreign parties, and shall

be governed accordingly to the exclusion of any local law contrary to the contractual choice of law provisions herein. The company and crew member also acknowledge that they voluntarily and knowingly waive any right they have to a jury trial.

> [A]ny and all disputes, claims or controversies whatsoever . . . shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958) (the "Convention") in Hamilton, Bermuda, to the exclusion of any other fora, in accordance with the Bermuda International Conciliation and Arbitration Act 1993 and the UNCITRAL Arbitration Rules as at present in force, all of which are deemed to be incorporated herein by reference into this provision. If, and only if, the Bermuda venue provision is found legally unenforceable, then and only then, all disputes shall be resolved by binding arbitration pursuant to the Convention exclusively in Los Angeles, California, and will be administered by the American Arbitration Association under its international dispute resolution procedures.

Sauceda Decl., Ex. B at 10–11. The Terms and Conditions also contain an Section 15, which provides that "[t]he conditions of these Terms are severable. If any of these Terms is determined to be void or otherwise unenforceable by any court or tribunal of competent jurisdiction, then the remainder of the Terms shall stand in full force and effect." *Id.* at 11.

The parties' submissions reference another written contract between PCL and its employees, namely the "Crew Agreement." Article 1 of the Terms and Conditions provides:

Any employee (also referred to as a "crew member") to whom these Terms are applicable shall be considered a member of the crew in the service of the assigned ship and covered by these Terms with effect from the date on which the crew member signs the ship's Crew Agreement. . . .

Sauceda Decl., Ex. B at 3. Every employee is required to sign the Crew Agreement on joining a PCL vessel. *Id.* PCL has not produced a Crew Agreement, but has provided a document entitled "List of Crew and Signatures of Seamen Who Are Parties to the Crew Agreement." Sauceda Supplemental Decl., Ex. A. Dumitru's full name appears on this list, accompanied by a signature in the field for "Signature of Seaman on engagement." *Id.* Dumitru has submitted an affidavit to the Court, stating that the signature on the list is not his, and that he was not presented with either the Crew Agreement or the list of crew who are parties to the Crew Agreement when he joined the M/V Star Princess. Pl.'s Reply Mem. (Case 1), Ex. 1 ¶¶ 8–9.

### PROCEDURAL BACKGROUND

■ Plaintiff originally filed suit in the Southern District of Florida on October 15, 2008, alleging one court of negligence under the Jones Act. Decl. of William Enger in Supp. of Def.'s Motion to Compel Arbitration, Ex. B. On April 1, 2009, the Southern District of Florida dismissed that suit without prejudice for failure to prosecute. Enger Decl., Ex. C. On April 30, 2009, Dumitru filed suit in the Supreme Court of the State of New York, New York County,[3] again alleging one count of negligence under the Jones Act.

PCL moved *ex parte* for an anti-suit injunction in the Supreme Court of Bermu-

da, on the grounds that plaintiff's claim was subject to arbitration in Bermuda. PCL sent a summons to plaintiff and his counsel by email on May 18, 2009; plaintiff contends that this did not provide adequate notice. Pl.'s Mem. in Opp'n to Def.'s Motion to Compel Arbitration (Case 1) 21. On May 20, 2009, the Bermuda court enjoined Dumitru from bringing "any other proceedings, or making any claims similar to the claims presently being made in the Supreme Court of the State of New York." Decl. of Rod S. Attride–Stirling in Supp. of Def.'s Motion to Compel Arbitration (Case 1), Ex. E.

On May 21, 2009, PCL removed the first action to this Court. Notice of Removal (Case 1). On February 17, 2010, Dumitru filed a second suit in the Supreme Court of the State of New York, New York County, alleging claims for unseaworthiness, maintenance and cure, and lost wages under the Seaman's Wage Act. On March 5, 2010, PCL removed the second case to this Court. Notice of Removal (Case 2).

Following extensive briefing from both parties, this Court held oral argument on the present cross-motions on July 12, 2010 ("Oral Argument").

### DISCUSSION

PCL moves to compel arbitration of this matter pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958) (the "Convention") because the parties agreed to arbitrate in Bermuda. Plaintiff contends that there was no agreement to arbitrate governed by the Convention, and that several grounds exist for finding the purported agreement unenforceable. Plaintiff also moves to remand this matter to state

---

**3.** PCL is registered with the New York Secretary of State as a foreign corporation doing business in New York State, with a registered agent residing in New York, New York. Ac-

cordingly, the Supreme Court of the State of New York had personal jurisdiction over PCL and venue was proper in New York County. *See* 46 U.S.C. § 30104; 45 U.S.C. § 56.

court on the grounds that this Court lacks removal jurisdiction. For the reasons discussed below, defendant's motion is granted in part and denied in part, and plaintiff's motion is denied.

## I. Defendant's Motion to Compel Arbitration

PCL's motion presents three key questions. First, did the parties enter an agreement to arbitrate that falls under the Convention? *See* Part I(A). Second, if there is an agreement under the Convention, do plaintiff's affirmative defenses to arbitration make any part of the parties' agreement unenforceable? *See* Part I(B). Third, if any part of the agreement is unenforceable, should the offending provisions be severed such that arbitration may be compelled without the unenforceable conditions? *See* Part I(C).

### A. The Parties' Agreement Falls under the Convention

■ There are four basic requirements for enforcement of arbitration agreements under the Convention: "(1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 92 (2d Cir.1999). A district court must grant a motion to compel arbitration unless these jurisdictional prerequisites are not met or one of Convention's affirmative defenses applies. 9 U.S.C. §§ 3, 201–208; *see Bautista v. Star Cruises*, 396 F.3d 1289, 1294–95 (11th Cir.2005); *Standard Bent Glass Corp. v. Glassrobots Oy*,

333 F.3d 440, 449 (3rd Cir.2003). The scope of inquiry for a court considering a petition to compel arbitration under the Convention is "very limited." *Smith/Enron*, 198 F.3d at 92 (citation omitted).

■ In the present case, the second and fourth jurisdictional requirements are easily satisfied because Bermuda is a signatory of the Convention and plaintiff is a Romanian citizen.[4] Plaintiff challenges the first requirement, claiming that the parties never entered a written agreement to arbitrate, and the third requirement, contending that seamen's employment contracts are specifically exempted from the definition of "commercial" relationships under the Convention.

### i. There Was a Written Agreement To Arbitrate

■ The Convention requires a written agreement to arbitrate differences arising out of a defined legal relationship. Convention, Art. II § 1. This can be contained in a contract or an exchange of letters or telegrams. *Id.* at § 2. Plaintiff claims that PCL's failure to provide a signed Crew Agreement demonstrates that the parties did not enter a written agreement to arbitrate. Pl.'s Opp'n Mem. 4.

■ Plaintiff's argument fails for two reasons. First, Dumitru signed the Acceptance Agreement which provided that "any and all disputes" would be resolved by arbitration as provided by the Terms and Conditions. Sauceda Decl., Ex. A. Dumitru also acknowledged reviewing the Terms and Conditions and agreed to abide by them. *Id.* This is sufficient to satisfy the written agreement requirement of the Convention.[5]

---

**4.** Plaintiff argues that Bermuda is not a "full" signatory to the Convention because the United Kingdom signed on Bermuda's behalf. Pl.'s Opp'n Mem. (Case 1) 4–5. Plaintiff provides no authority to support this theory. We therefore follow the other courts in this District that have treated Bermuda as a signatory to the Convention. *See, e.g., Corcoran v. Ardra Insurance Co.*, 657 F.Supp. 1223, 1228 (S.D.N.Y.1987).

**5.** Some courts have found the written agreement requirement to be satisfied even when

Second, Dumitru's name appears on the "List of Crew and Signatures of Seamen Who Are Parties to the Crew Agreement." Sauceda Supplemental Decl., Ex. A. Although plaintiff stated in his affidavit that he was not presented with a Crew Agreement and did not sign the list, his position is at odds with the premise for his lawsuit, *i.e.*, that he was employed by PCL and was a crew member on the date of his injury. The Terms and Conditions, by which Dumitru agreed to abide, require every new crew member to sign a Crew Agreement. Sauceda Decl., Ex. B at 3. Dumitru cannot bring suit based on his status as a PCL employee while simultaneously claiming that the agreed-upon conditions of his employment were never met. Accordingly, PCL's failure to produce a Crew Agreement is no impediment to enforcement of the arbitration provision in the Acceptance Agreement and the Terms and Conditions.

### ii. The Convention Does Not Exempt Seamen's Employment Contracts

Plaintiff's second jurisdictional challenge is a legal argument that requires an understanding of the structure of the federal arbitration statute. The Federal Arbitration Act ("FAA") was enacted in 1925 and codified in 1947 as Chapter 1 of Title 9 of the United States Code. Pub. L. No. 80–392, 61 Stat. 669 (1947) (codified as 9 U.S.C. §§ 1–16). The Convention, which addressed international arbitration agreements, was signed in 1958 and codified in 1970 as Chapter 2 of Title 9 of the United States Code. Pub. L. No. 91–368, 84 Stat. 692 (1970) (codified as 9 U.S.C. §§ 201–208). Although courts often refer to the entirety of Title 9 as the FAA, this memorandum uses "FAA" to refer to the statute contained in Chapter 1 of Title 9 and "Convention" to refer to Chapter 2 of Title 9.

The first two provisions of Chapter 1 are relevant to this action. Section 1, entitled " 'Maritime transactions' and 'commerce' defined; exceptions to operation of title," provides in pertinent part that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Section 2 provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

Those two provisions in the FAA are to be considered alongside the following provision in the Convention, as codified in Chapter 2:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention.

9 U.S.C. § 202.

It is undisputed that the arbitration agreement in this case is contained in a

---

the arbitration agreement is contained in a separate document incorporated by reference into the main contract. *See, e.g., Allen v. Royal Caribbean Cruise, Ltd.,* No. 08–22014–Civ., 2008 WL 5095412, at *5 (S.D.Fla.2008).

The result is even clearer here, since the agreement to arbitrate was contained both in the main contract, the Acceptance Agreement, and in the supplemental Terms and Conditions to which the contract refers.

seamen's employment contract. Plaintiff contends that the exemption for seamen's employment contracts under 9 U.S.C. § 1 (hereafter, the "exemption clause") applies to international commercial arbitration agreements that would otherwise fall under the Convention pursuant to 9 U.S.C. § 202. In support of this position, plaintiff argues that: (1) the phrase "exceptions to operations of title" in the heading for 9 U.S.C. § 1 means that the exemption clause applies to the whole of Title 9, including the Convention as codified in Chapter 2; (2) the constitutional distinction between commercial and maritime matters compels plaintiff's reading of 9 U.S.C. § 202; (3) the legislative history of the Convention shows that seamen's employment contracts were intended to be exempt; and (4) there is a longstanding federal policy protecting seamen.

At the outset, we note that plaintiff's reading of the statute has been rejected by the Fifth, Ninth, and Eleventh Circuits, three courts that deal routinely with maritime cases. *See Francisco v. Stolt Achievement MT*, 293 F.3d 270, 273–74 (5th Cir.2002), *cert. denied*, 537 U.S. 1030, 123 S.Ct. 561, 154 L.Ed.2d 445 (2002); *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1155–57 (9th Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2827, 174 L.Ed.2d 553 (2009); *Bautista v. Star Cruises*, 396 F.3d 1289, 1298–1300 (11th Cir.2005), *cert. dismissed*, 545 U.S. 1136, 125 S.Ct. 2954, 162 L.Ed.2d 884 (2005). Each of these circuits held that the only limitation on the scope of the Convention was that it applied to relationships which are considered "commercial," and that, accordingly, arbitration provisions in seamen's employments contracts of an international character were enforceable because the exemption clause in 9 U.S.C. § 1 did not apply. *Id.* Nevertheless, since the Second Circuit has yet to

address the issue, we consider each of plaintiff's arguments in turn.

Plaintiff's strongest argument is that Section 1 of Title 9 appears under the heading "exceptions to operation of *title*." 9 U.S.C. § 1 (emphasis added). Since the Convention was codified as Chapter 2 of Title 9, applying the exemption clause to the Convention has a simple, neat logic. However, the heading of Section 1 dates back to 1947, when the FAA comprised the entirety of Title 9; the Convention was enacted approximately 23 years later.[6] Thus, it is unclear whether the heading should be read to apply Section 1 to the entire "title" as it exists today, or whether it applies only Chapter 1 (the "title" as it existed in 1947). Since the text of the Convention supports the latter approach, plaintiff's statutory heading argument is ultimately unsuccessful.

■■■ While section headings "are tools available for the resolution of a doubt about the meaning of a statute," *Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 43, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) (internal quotations omitted), they do not override clear statutory text. *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 866 (2d Cir.1997); *see also* Norman J. Singer, 2A *Sutherland Statutory Construction* § 47:3 (7th ed. 2010) (section headings "may not be used as a means of creating an ambiguity when the body of the act itself is clear"). Here, the language of the Convention is clear: Federal courts can enforce arbitration agreements arising out of any international relationship that is "commercial." 9 U.S.C. § 202; *see Bautista*, 396 F.3d at 1298 n. 12; *STOLT*, 293 F.3d at 275. The statute does not refer to or create any exemptions.

---

**6.** *See* Pub. L. No. 80–392, 61 Stat. 669 (1947); Pub. L. No. 91–368, 84 Stat. 692 (1970).

When the Convention was enacted, its drafters included specific references to FAA provisions that the new legislation incorporated; no reference was made to the exemption for seaman's employment contracts. Section 202 states that the Convention's jurisdiction includes "agreements described in section 2 of this title," yet the exemption clause in Section 1 is not mentioned.[7] 9 U.S.C. § 202; *see Bautista,* 396 F.3d at 1298. In addition, Section 208 of the Convention provides that "Chapter 1 [*i.e.,* the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States." 9 U.S.C. § 208.

Reading the Convention as a whole, it appears that the drafters of the enabling legislation were fully cognizant of its interplay with the long-established law of the FAA. Where the drafters wished to incorporate a provision of the FAA, they included a cross-reference. Foreseeing the possibility of conflict between the Convention and the FAA, the drafters provided that the Convention has primacy. Under these circumstances, the lack of any reference to the exemption clause in the Convention supports the conclusion that the exemption does not apply.

Plaintiff's other textual argument is also unavailing. We first review the operative language of 9 U.S.C. § 202: "An arbitration agreement ... arising out of a legal relationship .... which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." In *Bautista,* the Eleventh Circuit interpreted Section 202 to provide the Convention with jurisdiction over the universe of commercial arbitration agreements, of which an "agreement described in section

2 of this title" would be one example. *Bautista,* 396 F.3d at 1298. The *Bautista* court understood the reference to Section 2 to be "generally illustrative of the commercial legal relationships covered by section 202," noting that "the term 'including' ... connotes simply an illustrative application of the general principle." *Id.* (internal citations and quotations omitted).

Plaintiff contends that *Bautista* and its progeny are wrong because their reading of 9 U.S.C. § 202 ignores the distinction between "commercial" and "maritime" matters that is rooted in the Constitution. This argument proceeds in four stages. First, the federal judicial power over admiralty and maritime cases has "a separate jurisdictional basis" from controversies arising under the laws and treaties of the United States. Pl.'s Opp'n to Def.'s Motion to Compel Arbitration (Case 2) 16; *see* U.S. Const., Art III, § 2. Second, the Convention's jurisdiction over "commercial" agreements is in the latter category; Section 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. Third, since "commercial" agreements do not include maritime agreements, the Convention only has jurisdiction over maritime matters because of the phrase "including a transaction, contract, or agreement described in section 2 of this title." 9 U.S.C. § 202. Finally, since the exemption clause of Section 1 applies to Section 2, and since the only maritime matters governed by the Convention are those described in Section 2, seamen's employment contracts are exempt from the Convention.

To begin with, plaintiff's argument confuses the jurisdictional authority of a court

---

7. Plaintiff argues that it is precisely because Section 202 refers to Section 2 that the exemption clause of Section 1 applies to the

Convention. This argument is discussed *infra.*

and the legislative authority of Congress. Yet the principal flaw in plaintiff's reasoning is that seamen's employment contracts can be defined as both maritime and commercial. Seamen's employment contracts are encompassed by Section 202 because they "aris[e] ... out of a relationship which his considered commercial." 9 U.S.C. § 202. There is therefore no need to consider the language in Section 202 that incorporates Section 2. Moreover, if we do so, we agree with the *Bautista* court that the word "including" makes the reference to Section 2 "illustrative." 396 F.3d at 1298. Plaintiff misreads Section 202, substituting "as well as" for "including" in order to argue that the only maritime matters under the Convention are those described in Section 2. The plain meaning of the text is that the Convention governs all commercial agreements, of which Section 2 agreements are a subset. Seamen's employment contracts are yet another subset within the universe of commercial agreements under by the Contention.[8]

Plaintiff's next argument is based on the legislative history of the Convention. Plaintiff cites the congressional testimony of State Department Ambassador Richard Kearney, which indicated that the definitions in Section 1 of the FAA would apply to the Convention. S.Rep. No. 91–702, at 6 (1970); *see* Pl.'s Opp'n Mem. (Case 2) 14–15. Although this testimony can be read to support plaintiff's reading of the statute, Ambassador Kearney did not mention seamen's employments contracts or the Section 1 exemption clause. *See Stolt,* 293 F.3d at 276. The same is true of two other excerpts from the Convention's legislative history that plaintiff submits to the Court.[9] Moreover, as the Fifth Circuit noted in *Stolt:*

> [T]he testimony of a witness not a member of Congress cannot bind this court where the plain language of the Convention Act does not provide an exception for seaman employment contracts. "Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress."

293 F.3d at 276(quoting *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 120, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)); *see also Bautista,* 396 F.3d at 1298 ("Although it is plausible to infer from Ambassador Kearney's comments that he believed the section 1 exemptions should apply to the Convention Act, his views as a single State Department official are a relatively unreliable indicator of statutory intent.").

Finally, plaintiff argues that there is a federal policy of protecting seamen, whom plaintiff describes as "a class protected by Congress since 1790." Pl.'s Opp'n Mem. (Case 1) 19. This argument is easily countered, however, by the competing policy in favor of arbitration agreements. *See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also In the Matter of Nicholas Schreiber v. K–Sea Transportation Corp.,* 9 N.Y.3d 331, 340, 849 N.Y.S.2d 194, 879 N.E.2d 733 (N.Y. 2007) (the doctrine that seamen are "wards of admiralty" does not outweigh the policy favoring arbitration). When the FAA was

---

**8.** Plaintiff argues that his reading of the statute is supported by the recent Supreme Court case, *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). *See* Oral Argument Tr. 41. We disagree. That decision does not mention the exemption clause in Section 1, does not address a seaman's employment contract, and does not overturn *Bautista* or any related cases.

**9.** S. Exec. Rep. No. 90–10 (Sept. 27, 1968), at 7; *see* Pl.'s Opp'n Mem. (Case 2), Ex. 2. President Johnson's Presentation of the Convention to the Senate (April 24, 1968); *see* Pl.'s Opp'n Mem. (Case 2), Ex. 3.

first enacted in 1925, there was undoubtedly a concern over the rights of seamen and railroad workers, which resulted in the exemption clause in 9 U.S.C. § 1. Yet by the time the Convention was enacted in 1970, political winds were behind the enforcement of arbitration agreements, particularly in the realm of international commerce. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) ("The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."). Accordingly, plaintiff's policy argument does not justify exempting seamen's contracts from the enforcement of international arbitration agreements.

For the reasons described above, we find that Dumitru and PCL entered an arbitration agreement that falls under the Convention.

## B. The Arbitration Agreement Contains Unenforceable Provisions

 We turn now to plaintiff's affirmative defenses to arbitration. The Convention provides an affirmative defense to arbitration if the agreement is "null and void, inoperative or incapable of being performed." 9 U.S.C. § 201. The Convention's "null and void" clause has been interpreted to encompass "only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." *Apple & Eve, LLC v. Yantai N. Andre Juice Co.,* 610 F.Supp.2d 226, 228 (E.D.N.Y.2009) (quot-

ing *Bautista,* 396 F.3d at 1302). In addition, the text of the Convention treaty provides that "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that ... [t]he recognition or enforcement of the award would be contrary to the public policy of that country." Art. V, § 2(b); *see Thomas v. Carnival Corp.,* 573 F.3d 1113, 1120 (11th Cir.2009) (recognizing this defense on a motion to compel arbitration). However, the Convention's public policy defense is "construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512, 516 (2d Cir.1975).

For the reasons described below, we find the Bermuda choice-of-law and choice-of-venue provisions unenforceable. However, since the offending provisions are severable, *see* Part I(C), and the core agreement to arbitrate is enforceable, *see* Part I(B)(ii), plaintiff's claims must be arbitrated.[10]

### i. Bermuda Choice–of–Law is Unenforceable

Plaintiff argues that the Bermuda choice-of-law provision in Article 14 of the Terms and Conditions should not be enforced because it operates as a prospective waiver of his U.S. statutory rights in violation of public policy. Pl.'s Opp'n Mem. (Case 1) 9–13. Plaintiff relies on two Supreme Court cases that discuss this particular affirmative defense under the Convention. Pl.'s Opp'n Mem. (Case 1) 12

In the first of these cases, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* the Supreme Court considered claims

---

**10.** The Southern District of Florida recently considered Article 14 of PCL's Terms and Conditions and reached a similar conclusion. *See Krstic v. Princess Cruise Lines,* 706 F.Supp.2d 1271, 1279–80 (S.D.Fla.2010) (holding that the choice-of-law clause is void, but that, in light of the severability provision, the arbitration clause is enforceable).

under the Sherman Act in the face of an agreement to arbitrate in Japan. 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The Court upheld the arbitration provision because, since U.S. law would be applied in arbitration, "the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Id.* at 637, 105 S.Ct. 3346. The Court added in a footnote that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies ..., we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. 3346. This principle was reiterated in *Vimar Seguros y Reaseguros v. M/V Sky Reefer*, when the Supreme Court enforced an agreement to arbitrate in Japan at an interlocutory stage of the proceedings when it was unclear whether the arbitrator would apply U.S. law. 515 U.S. 528, 539–40, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). The *Vimar* court placed particular emphasis on its opportunity to review the outcome of arbitration at a later stage. *Id.*

Synthesizing these two cases, the Eleventh Circuit in *Thomas v. Carnival Corp.* declared that "arbitration clauses should be upheld if it is evident that either U.S. law definitely will be applied or if, [sic] there is a possibility that it might apply *and* there will be later review." 573 F.3d at 1123 (emphasis in original). Applying this approach, the *Thomas* court invalidated an agreement to arbitrate a Seaman's

Wage Act claim in the Philippines under Panamanian law, finding that the choice-of-law and choice-of-venue provisions "operated in tandem to completely bar Thomas from relying on any U.S. statutorily-created causes of action," and that the court had "no opportunity for review" because of the "distinct possibility" that the plaintiff would receive no award under Panamanian law. *Id.* at 1123–25 (internal quotations omitted).

Dumitru argues that this case is indistinguishable from *Thomas* because the Bermuda choice-of-law provision requires the application of Bermuda law in arbitration, which would bar Dumitru from vindicating his rights under the Seaman's Wage Act and the Jones Act.[11] PCL argues in response that this case can be distinguished from *Thomas* because (a) Dumitru has a remedy under Bermuda law, (b) this Court has an opportunity for later review, and (c) it is not clear that U.S. law would apply to Dumitru's claims absent the choice-of-law provision. PCL also argues that *Thomas* is wrongly decided and should not be followed.

█ We agree with plaintiff that the Bermuda choice-of-law provision is unenforceable. The rule articulated in *Thomas* follows directly from the Supreme Court precedent in *Mitsubishi* and *Vimar*, and provides a clear standard for when statutory claims under U.S. law may be sent to arbitration. We therefore proceed to apply *Thomas* to the facts of this case.

**11.** Plaintiff also contends that the application of Bermuda law would result in the enforcement of a $50,000 damages cap. Article 8 of the Terms and Conditions provides that an injured employee "shall be entitled to compensation," "in exchange for the crew member's signing a full release of the Company." Sauceda Decl., Ex. B at 7. The compensation varies based on the degree of disability, with a maximum of $50,000. Plaintiff argues that this constitutes a damages cap that is unen-

forceable under *Thomas*. However, we read Article 8 to provide an optional, not mandatory, means of compensation. *See Krstic v. Princess Cruise Lines, Ltd.*, 706 F.Supp.2d at 1280 n. 12 (interpreting similar contractual language as providing an optional compensation scheme). In addition, defendant acknowledged at oral argument that the $50,000 cap would not apply to plaintiff's statutory claims. Oral Argument, Tr. 53–54.

Dumitru clearly does not have a remedy for his statutory claims in Bermuda. As the Eleventh Circuit noted, the "inability to bring a Seaman's Wage Act claim certainly qualifies as a 'prospective waiver' of rights, including one of a private litigant's 'chief tools' of statutory enforcement—the Act's treble-damages wage penalty provision for late payments." *Thomas,* 573 F.3d at 1123 (quoting *Mitsubishi,* 473 U.S. at 635, 105 S.Ct. 3346). The same logic applies to plaintiff's Jones Act claim.[12] Although defendant asserts that Bermuda law provides adequate remedies for a negligence claim, plaintiff's statutory rights under the Jones Act far exceed that provided by a common law negligence action in Bermuda. The Jones Act imposes, *inter alia,* a lower burden of proof for the plaintiff on causation, and vicarious liability on maritime employers for the negligence of ships' officers and crew. 46 U.S.C. § 30104; 45 U.S.C. § 51; *Ferguson v. Moore–McCormack Lines, Inc.,* 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). The absence of these employee protections under Bermuda law prevents plaintiff from vindicating his Jones Act rights, just as the absence of a treble-wages penalty impedes plaintiff's rights under the Seaman's Wage Act.[13]

This case also presents the Court with no meaningful "opportunity for review" of the arbitration under Bermuda law. If Dumitru has a valid claim under the Jones Act or the Seaman's Wage Act, yet recovers nothing under Bermuda law, this Court would have no opportunity to review that decision and no award to enforce. *See Thomas,* 573 F.3d at 1124 ("If, applying Panamanian law, Thomas receives no award in the arbitral forum—a distinct possibility given the U.S. based nature of his claim—he will have nothing to enforce in U.S. courts, which will be deprived of any later opportunity to review.").

Finally, PCL tries to distinguish *Thomas* because that decision assumed U.S. law would apply to the plaintiff's claim in the absence of the choice-of-law clause. If, by contrast, foreign law applies to Dumitru's claims in the first instance, the Bermuda choice-of-law provision would be enforceable because Dumitru is not being deprived of any rights or causes of action. *See, e.g., Vesuna v. C.S.C.S. Int'l, N.V.,* No. 09–20286–civ, 2009 WL 4543319, at *3 n. 2 (S.D.Fla. Nov. 30, 2009) (distinguishing *Thomas* on this basis). Accordingly, PCL could enforce its choice-of-law provision by establishing that U.S. law does not apply to any of Dumitru's claims.

In *Lauritzen v. Larsen,* the Supreme Court established seven factors to be considered in determining whether a particular ship owner should be held to be an 'employer' for Jones Act purposes: "(1)

**12.** The Eleventh Circuit declined to address the arbitration and choice-of-law clauses' enforceability with regard to Mr. Thomas' Jones Act claims because it held that the Jones Act claims "[did] not fall under the Arbitration Clause;" it reached this conclusion based on the fact that Thomas' Jones Act claims arose before he signed the agreement containing the clauses at issue. *Thomas,* 573 F.3d at 1120 & n. 9.

**13.** The Southern District of Florida has twice held that PCL's Bermuda choice-of-law provision is unenforceable against a plaintiff who brings a Jones Act claim. *See Krstic v.* *Princess Cruise Lines,* 2010 WL 1542083, at *5; *Rozanska v. Princess Cruise Lines, Ltd.,* No. 07–23355, 2008 U.S. Dist. LEXIS 95773, at *17 (S.D.Fla. Aug. 5, 2008). In *Rozanska,* the court concluded that "Princess selected Bermuda law to apply because there are no comparable causes of action in Bermuda which are similar to the Jones Act or United States admiralty law for maintenance and cure," and that, accordingly, "[t]he purpose of the clause was to deprive Plaintiff of her Jones Act and maintenance and cure causes of action." 2008 U.S. Dist. LEXIS 95773, at *17.

the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of a foreign forum; and (7) the law of the forum." 345 U.S. 571, 583–92, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). In *Hellenic Lines Ltd. v. Rhoditis,* the Supreme Court added the defendant's "base of operations" as an eighth factor to be considered, noting that this last factor could outweigh several other factors favoring foreign law:

> The [defendant's ship] was not a casual visitor; rather, it and many of its sister ships were earning income from cargo originating or terminating here. We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act "employer." The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country.

398 U.S. 306, 309–10, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Following *Rhoditis,*

several courts have treated the eighth factor as determinative. *See Membreno v. Costa Crociere S.p.A.,* 425 F.3d 932, 936 (11th Cir.2005) ("[I]f the defendants have a substantial base of operations in the United States, this factor alone can justify the application of United States law."); *Rozanska,* 2008 U.S. Dist. LEXIS 95773, at *11 n. 2 ("the eighth factor, the place of operation, substantially predominates and outweighs all other factors").

■ In the present case, it is undisputed that PCL maintains a substantial base of operations in Los Angeles, California, and earns income from cruises originating and terminating in the United States. As in *Rhoditis,* PCL is "engaged in an extensive business operation in this country." 398 U.S. at 310, 90 S.Ct. 1731. The District Court of the Southern District of Florida has twice held that PCL is a Jones Act employer because its base of operations is in the United States. *See Rozanska,* 2008 U.S. Dist. LEXIS 95773, at *12–13; *Matuszevoska v. Princess Cruise Lines, Ltd.,* 2007 U.S. Dist. LEXIS 98074, at *12–13 (S.D.Fla. Feb. 12, 2007). Accordingly, notwithstanding other factors that weigh towards foreign law,[14] United States law applies to Dumitru's Jones Act claim.

For the reasons discussed above, the Bermuda choice-of-law provision in Article 14 is unenforceable.[15]

**14.** The first six factors would support application of foreign law: Dumitru's injury occurred in international waters (1) aboard a Bermuda-flagged vessel (2); Dumitru is a Romanian citizen (3) who signed an employment contract with a Bermuda-incorporated company (4) in Romania (5); and Bermuda is an accessible forum (6). The seventh factor supports U.S. law, because PCL is properly subject to personal jurisdiction in this Court. We note also that Dumitru first joined the vessel in Florida, and that the cruise departed from and returned to a U.S. port. Oral Argument

Tr. 10, 22. Since the list of factors is not exhaustive, *see Rhoditis,* 398 U.S. at 309, 90 S.Ct. 1731, these additional facts can be weighed in favor of applying U.S. law.

**15.** In light of our conclusion, we need not address PCL's proposed stipulation to consent to the application of U.S. law to plaintiff's statutory claims. Oral Argument Tr. 53. Since Bermuda law will not be enforced, plaintiff can proceed on any claims that are cognizable under the applicable conflicts-of-laws rules.

### ii. Core Agreement to Arbitrate Is Valid

Plaintiff argues that arbitration cannot be enforced because he has the right to a jury trial and the right to choose a forum. The Jones Act provides the right to trial by jury and incorporates the law regulating recovery for personal injury or death of a railway employee, *i.e.,* the Federal Employers Liability Act ("FELA"). 46 U.S.C. § 30104. A plaintiff may bring an action under FELA in state or federal court "in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action." 45 U.S.C. § 56 ("FELA § 6"). FELA also provides that any "device" in a contract which enables a common carrier to exempt itself from liability "shall to that extent be void." 45 U.S.C. § 55 ("FELA § 5").

■■■ Plaintiff contends that pursuant to these provisions his Jones Act claim cannot be arbitrated. However, this position is contrary to Second Circuit and Supreme Court precedent. First, "it is well-settled that waivers of jury trial are fully enforceable under the FAA." *Harrington v. Atlantic Sounding Co., Inc.,* 602 F.3d 113, 126 (2d Cir.2010) (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. 3346.

In *Harrington,* the Second Circuit addressed plaintiff's argument that the right to choose a forum under FELA § 6, when read in conjunction with FELA § 5, renders agreements to arbitrate Jones Act claims unenforceable. 602 F.3d at 119–24. This argument relies on *Boyd v. Grand Trunk Western Railroad Co.,* in which the Supreme Court invoked FELA § 5 to invalidate an agreement with a venue-selection clause because the Court found that FELA § 6 guaranteed an injured party's "right to bring the suit in any eligible forum." 338 U.S. 263, 265, 70 S.Ct. 26, 94 L.Ed. 55 (1949) (per curiam). The Second Circuit in *Harrington* addressed an agreement to arbitrate, as opposed to a venue selection clause, and distinguished *Boyd* on the grounds that it was "not decided under the FAA, which ... reflects a liberal federal policy favoring arbitration agreements." 602 F.3d at 121 (quoting *Gilmer,* 500 U.S. at 35, 111 S.Ct. 1647). The Circuit found that "FELA § 6 does not apply to seamen's arbitration contracts" and upheld the arbitration agreement. 602 F.3d at 115, Accordingly, we reject Dumitru's argument that arbitration is prohibited by FELA §§ 5–6.[16]

### iii. Bermuda Venue for Arbitration Is Unenforceable

While we conclude that parties can agree to arbitrate a Jones Act claim, whether a Jones Act employer can specify Bermuda as a venue for arbitration presents a somewhat separate question. The issue again involves an analysis of the *Boyd* and *Harrington* cases.

In *Boyd,* the Supreme Court declared invalid an injured railroad employee's

---

**16.** Plaintiff seeks to distinguish *Harrington* because that case addressed a post-injury arbitration agreement, while this action involves a seamen's employment contract which plaintiff argues is exempt from the Convention. Supplemental Mem. in Supp. of Pl.'s Motion to Remand 4. However, since we conclude that arbitration agreements in seamen's employment contracts are enforceable under the Convention, *see* Part I(A)(ii), *Harrington* is controlling.

agreement to bring suit only where the employee resided or where injuries were sustained. 338 U.S. 263, 70 S.Ct. 26. The foundation for the *Boyd* holding is that the "right to select the forum granted in [FELA] § 6 is a substantial right." 338 U.S. at 266, 70 S.Ct. 26. In *Harrington,* the Second Circuit considered the holding of *Boyd* and stated that "[t]he purpose of [FELA] § 6 is to ensure the existence of a practical and convenient forum to adjudicate the employee's rights, not to ensure the existence of a particular type of forum." 602 F.3d at 122. *Harrington* ultimately upheld the arbitration agreement after emphasizing that the parties had agreed to an arbitral forum "without geographical constraints." *Id.* The court also distinguished several cases involving contractual provisions that specified a particular judicial or arbitral venue.[17]

■ The choice of Bermuda venue in PCI's Terms and Conditions presents a key distinction between this case and *Harrington.* Under FELA § 6, a plaintiff can file suit in the district where defendant resides, where the cause of action arose, or anywhere defendant does business. 45 U.S.C. § 56. Harrington was able to commence arbitration anywhere that would be available to him as a judicial venue under FELA, eliminating the risk that his claims would be adjudicated in an inconvenient forum. Dumitru, on the other hand, is contractually bound to arbitrate in a particular forum that has no connection to the place of his injury. Moreover, since the Bermuda choice-of-law provision is unenforceable, plaintiff's claims under U.S. law have little relationship to a Bermuda arbitral forum. Under these circumstances, the selection of Bermuda venue seems to violate FELA § 6 as interpreted by *Harrington.*

Defendant indicated in its submissions to the Court that it is prepared to forgo Bermuda venue, agreeing instead to enforce the Terms and Conditions' alternate arbitration provision which provides for venue in Los Angeles, California. Mem. in Supp. of Def.'s Motion to Compel Arbitration (Case 2) 12–13. This concession seems merely to kick the can down the road, since the selection of venue in Los Angeles—close to PCL's base of operations—would also deprive Dumitru of his choice of forum under FELA § 6. However, the problem was resolved at oral argument by defendant's offer to stipulate its consent to arbitration in (i) New York, New York, (ii) Miami, Florida, or (iii) Los Angeles, California. Oral Argument Tr. 38. This satisfies *Boyd* because it gives Dumitru a choice of several locations that would be available under FELA § 6.[18] *Boyd* held that a FELA plaintiff has the right to select a "practical and convenient forum" from among the FELA § 6 venue choices.[19] *Harrington,* 602 F.3d at 122. In the present case, it is conceded that New York provides a convenient venue because Dumitru chose to file this action here. Accordingly, the alternate arbitration provision in the Terms and Condi-

---

17. For example, the *Harrington* court distinguished *Aaacon Auto Transport, Inc. v. State Farm Mut. Auto. Ins. Co.,* 537 F.2d 648 (2d Cir.1976). *Aaacon* involved a clause in an interstate carrier's standard-form bill of lading that required arbitration to be in New York City; the Second Circuit found the provision invalid under the Interstate Commerce Act's prohibition against any limitation of liability. 537 F.2d at 654–55; *see* 49 U.S.C. § 20(11).

18. PCL was doing business in each of the three jurisdictions at the time plaintiff brought this action. *See supra,* n. 3; Oral Argument Tr. 19–20.

19. We note that the plaintiff's right to choose a venue is not absolute. FELA § 6 provides three defendant-centric venue options: defendant's residence, where defendant allegedly caused plaintiff's injury, and defendant's place of business.

tions, as amended by defendant's proffered stipulation, may be enforced.

### C. The Unenforceable Provisions Should Be Severed

▓ Having concluded that the Bermuda choice-of-law and choice-of-venue clauses are unenforceable, we now consider whether those provisions should be severed and the core agreement to arbitrate enforced. A court "may not rewrite clear and unambiguous contracts," *Turner Const. Co. v. Kemper Ins. Co.,* 198 Fed. Appx. 28, 30 (2d Cir.2006) (summary order) (quoting *Chemical Bank v. Meltzer,* 93 N.Y.2d 296, 303, 690 N.Y.S.2d 489, 712 N.E.2d 656 (N.Y.1999)). However, the presence of a severability clause demonstrates that "severance was a contingency contemplated by the parties at the time of formation." *Booker v. Robert Half Int'l,* 413 F.3d 77, 83 (D.C.Cir.2005).

▓ In *Krstic v. Princess Cruise Lines,* the Southern District of Florida considered Article 14 of PCL's Terms and Conditions and found the Bermuda choice-of-law provision unenforceable under *Thomas.* 706 F.Supp.2d at 1278–80. The court then addressed the issue of severance:

> In crafting a remedy, I note that there are at [sic] two policy interests at issue here that must be respected, if possible. The first is the powerful "international policy favoring commercial arbitration," which, as the Supreme Court has expressly noted, requires the "subordinat[ion] [of] domestic notions of arbitrability" in domestic courts. [*Mitsubishi Motors Corp.,* 473 U.S. at 638–39, 105 S.Ct. 3346.] The second is the policy at the heart of the *Thomas* decision, which calls on courts to protect "a party's right to pursue statutory remedies" as a matter of "public policy." *Thomas,* 573 F.3d at 1122.
>
> ... I am faced with a stand-alone choice-of-law provision—in an agree-ment that expressly provides for severance of unenforceable provisions—that must be condemned as a matter of public policy.... Accordingly, I conclude that severance of the unenforceable choice-of-law provision is the appropriate remedy, as it promotes both policies at issue without having to unnecessarily elevate one over the other; the arbitration provision remains enforceable.

*Id.* at 1281. We agree with the court's analysis. In light of the strong federal policy favoring arbitration, the presence of the severability clause, and the fact that the choice-of-law provision stands separate and independent, severance is the proper remedy.

While *Krstic* did not discuss the choice-of-venue clause providing for arbitration in Hamilton, Bermuda, the same analysis applies. This provision is easily severed because Article 14 contains an alternate arbitration provision that specifically foresees the unenforceability of arbitration in Bermuda. Since both the choice-of-law and choice-of-venue clauses may be severed without rewriting any contractual language, the core agreement to arbitrate should be enforced and the offending provisions should be stricken from the Terms and Conditions.

### II. Plaintiff's Motion to Remand

▓ Under 28 U.S.C. § 1441, a defendant can remove an action to the United States District Court if that court has original jurisdiction over the action. 28 U.S.C. § 1441(a). Under 9 U.S.C. § 205, the Convention provides for removal "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention." Since the parties signed an arbitration agreement that falls under the Convention, *see* Part I(A), re-

moval is proper and plaintiff's motion to remand is denied.

Plaintiff argues that removal is prohibited because Jones Act cases are non-removable. Pl.'s Cross–Motion to Remand (case 1) 5–6; *see* 46 U.S.C. § 30104; 28 U.S.C. § 1445(a). Although this appears to conflict with the Convention's removal provision, plaintiff argues that specific prohibitions on removal are incorporated into the Convention because Section 205 provides that "[t]he procedure for removal of causes otherwise provided by law shall apply." 9 U.S.C. § 205.

We disagree with plaintiff's reading of the Convention. Section 205 incorporates "procedure[s] for"—rather than prohibitions on—removal.[20] Plaintiff has not cited any case in which a district court has remanded a Jones Act claim in the face of an arbitration agreement that falls under the Convention. Indeed, the fifth and eleventh circuit have affirmed the denial of motions to remand under these circumstances. *See Stolt*, 293 F.3d at 272; *Bautista*, 396 F.3d at 1300–01.

## CONCLUSION

For the reasons stated above, plaintiff's motion to remand is denied and defendant's motion to compel arbitration is granted in part and denied in part. The following language is hereby stricken from Article 14 of the Terms and Conditions incorporated into the Acceptance Agreement: the third and fourth sentences in their entirety, and the last 45 words of the sixth sentence (from "in Hamilton, Bermuda" to "this provision"). In addition, PCL has stipulated that it will consent to arbitration in New York, Miami, or Los Angeles. Accordingly, all of plaintiff's claims will be submitted to binding arbitration pursuant to Article 14 of the Terms and

Conditions, as amended by this decision and by defendant's voluntary stipulation.

This case is stayed pending resolution by arbitration, and the Clerk is respectfully directed to administratively close the case.

**IT IS SO ORDERED.**

---

**20.** 28 D.S.C. §§ 1446–48 specify certain procedures for removal to federal court, including rules about timing, notice, and filing.